UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ESSEX INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:09CV2071 TIA |
| | ) | |
| ROGER HARRIS, | ) | |
| HEDIGER ENTERPRISES, INC., | ) | |
| FORUM MANOR ASSOCIATES, L.P., | ) | |
| and FORUM MANOR L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Essex Insurance Company's Motion for Summary

Judgment. (Docket No. 25). Defendants Hediger Enterprises, Inc., Forum Manor Associates, L.P.,

and Forum Manor, L.L.C. filed a Memorandum in Opposition (Docket No. 37) and Defendant Roger

Harris filed a Response (Docket No. 38). Plaintiff Essex Insurance Company filed a Combined Reply

(Docket No. 42) thereto. All matters are pending before the undersigned United States Magistrate

Judge, with the consent of the parties, pursuant to 28 U.S.C. § 636(c).

Plaintiff Essex Insurance Company ("Essex") filed a Complaint for Declaratory Judgment

seeking the interpretation of certain insurance policies and a declaration of its rights and obligations

thereunder. (Plaintiff's Compl. at ¶ 8). Essex alleges that there is no coverage under a commercial

general liability policy Essex issued to Hediger Enterprises, Inc. ("Hediger") for a lawsuit brought

by the Department of Housing and Urban Development ("HUD") against Hediger and three other

Defendants for alleged violations of the Fair Housing Act ("FHA"). United States v. Roger Harris,

et al., Cause No. 4:09cv1859CEJ. In that lawsuit, HUD asserts that Roger Harris, the property

manager of an apartment complex operated by Hediger, discriminated against two current tenants and two prospective tenants on the basis of race, race association, sex, and retaliation. Through vicarious liability, the suit imputes the discriminatory conduct of Mr. Harris to Hediger as the operator of the apartment complex; Defendant Forum Manor Associates, L.P., as the owner of the complex, and Forum Manor L.L.C., as the only general partner of Forum Manor Associates, L.P. Essex has moved for summary judgment arguing that coverage does not exist under the insurance policy because there was no occurrence or expected or intended injury under the language of the policy, and because the policy's exclusion for wrongful acts applies excluding coverage.

The Eighth Circuit Court of Appeals recently clarified the appropriate standard for consideration of motions for summary judgment as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record is taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Trogerson v. City of Rochester, Cause No. 09-1131, 2011 WL 2135636, at *7 (8th Cir. June 1, 2011) (en banc) (citations and quotations omitted). "[T]he interpretation of an insurance contract is generally a question of law, particularly in reference to the question of coverage." D. R. Sherry

Constr., LTD v. American Mut. Ins. Co., 316 S.W.3d 899, 902 (Mo. banc 2010).

## The Undisputed Evidence before the Court on the Motion

Viewing all facts and drawing all reasonable inferences in the light most favorable of the nonmoving party, A. Brod, Inc. v. SK & I Co., L.L.C., 998 F. Supp. 314, 320 (S.D.N.Y. 1998) the Court sets forth the following facts:

### 1. Background

On October 1, 2007, Essex issued a Commercial General Liability Policy of insurance, Policy Number ARTX001297 ("Policy") to Hediger Enterprises, Inc. ("Hediger"), effective October 1, 2007 through October 1, 2008. (Complaint at ¶ 12; Exh. 3).

On November 12, 2009, the Secretary of the United States Department of Housing and Urban Development ("HUD"), through the Office of the General Counsel, filed its Complaint against Roger Harris, Hediger Enterprises, Inc., Forum Manor Associates, L.P., and Forum Manor L.L.C. (collectively "Defendants") for violations of the FHA. United States v. Roger Harris, et al., Cause No. 4:09cv1859CEJ (Complaint, Docket No. 1). On April 14, 2010, the United States filed its First Amended Complaint ("HUD Complaint") in that action. (Id. at Docket No. 28). The HUD Complaint was filed in this Court on behalf of four individuals who were allegedly discriminated against by Mr. Harris in his capacity as the property manager for Forum Manor Apartments. (Id. at ¶¶ 1,5).

On December 18, 2009, Essex filed the instant Complaint for Declaratory Judgment seeking the interpretation of certain insurance policies and a declaration of its rights and obligations thereunder regarding coverage under the commercial general liability policy issued to Hediger. (Plaintiff's Compl. at ¶ 8).

### 2. The HUD Complaint

On November 12, 2009, the United States brought an action to enforce Title VII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, on behalf of Anna Webster and her minor child, and Crystal Hall and her minor children, Lindsey Smith, and Daniel Howard and his minor children. <u>United States v. Roger Harris, et al.</u>, Cause No. 4:09cv1859CEJ (Complaint, Docket No. 1). Roger Harris ("Harris"), Hediger Enterprises, Inc.("Hediger"), Forum Manor Associates, L.P., and Forum Manor LLC were named as Defendants (collectively "Defendants"). Mr. Harris, a resident of Phelps County, Missouri has been Forum Manor's property manager and is responsible for all aspects of management at Forum Manor, including interviewing and approving prospective tenants, processing rental applications, determining tenant rent payments and overseeing maintenance staff. (<u>Id.</u> at ¶ 5). Hediger is a South Carolina corporation with its principal place of business in South Carolina. (<u>Id.</u> at 7). Hediger operates approximately sixty residential properties in multiple states, including Forum Manor Apartments, a 44-unit residential property located at 1900 Farrar Drive in Rolla, Missouri that is subsidized under the project-based Section 8 housing assistance program. (<u>Id.</u> at ¶¶ 4, 6). Forum Manor Associates, L.P., owns Forum Manor Apartments and is a limited partnership organized and existing under the laws of Missouri with its principal place of business in the State of Missouri. (<u>Id.</u> at 7). Forum Manor, L.L.C., is the only general partner of Forum Manor Associates, L.P., and is a limited liability corporation organized and existing under the laws of the State of South Carolina with its principal place of business in South Carolina. (<u>Id.</u> at 8). Hediger hired Mr. Harris as the property manager of Forum Manor, both on its own behalf and on behalf of Forum Manor Associates, L.P. and Forum Manor LLC, and supervises him as its employee. (Id. at ¶ 6).

In that case in the First Amended Complaint, the United States alleges Defendants engaged

in discriminatory conduct and sexual harassment in violation of the FHA.  United States v. Roger Harris, et al., Cause No. 4:09cv1859CEJ (First Amended Complaint, Docket No. 28).  In the First Claim for Relief, the United States alleges by their actions and statements Defendants refused to rent, refused to negotiate for the rental for, or otherwise made unavailable or denied, a dwelling because of race and sex; discriminated in the terms, conditions or privileges of the rental of a dwelling on the basis of race; represented, because of sex, that a dwelling is not available for inspection or rental when such dwelling is in fact so available; and coerced, intimidated, threatened or interfered with persons in the exercise or enjoyment of, or on account if their having exercised or enjoyed, their rights under the FHA.  (Id. at ¶ 32(a)-(e)).  The United States further contends that Defendants' actions were intentional, willful and /or taken in reckless disregard for the rights of others.  (Id. at ¶ 34).  In the Second Claim for Relief, the United States contends that Defendants' actions, conduct and statements, constitute a pattern or practice of resistance to the full enjoyment of rights granted by the FHA; and a denial to a group of persons of rights granted by the FHA.  (Id. at ¶ 36(a)-(b)).

In the Factual Allegations, the United States alleges that the First Amended Complaint is based on the four complaints of discrimination with the United States Department of Housing and Urban Development ("HUD") filed by Anna Webster "(Webster"), Lindsey Smith ("Smith"), Crystal Hall ("Hall"), and Daniel Howard ("Howard").  (Id. at ¶ 28).  Complainant Ms. Hall, an African-American single mother with four children, alleges that she visited Forum Manor Apartments rental office on June 18, 2008, to apply for an apartment, and Mr. Harris allegedly told her that "I don't rent to people like you," or words to that effect.  (Id. at 9).  When Ms. Hall attempted to apprise Mr. Harris that she had a job, Mr. Harris responded "I'm the owner and I don't rent to people who look like you," or words to that effect and shut the door and refused to provide Ms. Hall with a rental

application.  (Id. at 9).

Complainant Ms. Webster, a Caucasian single mother with two biracial children, alleges that Mr. Harris committed discriminatory housing practices by telling her she could not entertain African-American guests at her unit because such guests would scare the other tenants.  (Id. at 10).  Ms. Webster alleges that Mr. Harris called her youngest son a "nigglet" and referred to other biracial children at the property as "brown babies."  (Id. at 12).  Ms. Webster further alleged  that on March 16, 2008, while responding to an emergency maintenance call at her apartment  and finding her out-of-town guests, a biracial couple, sitting outside on her porch, Mr. Harris became irritated and told her, "What did I tell you about having all these niggers in your house?"  (Id. at 13).  Ms. Webster contends that as a result of Mr. Harris' discriminatory conduct, she moved from Forum Manor in September, 2008.  (Id. at 14).  On April 11, 2008, Ms. Webster filed a discrimination complaint with HUD.  (Id. at 15).  Following this complaint and investigation, Mr. Harris allegedly took a number of adverse actions against Ms. Webster including: falsely accusing her brother-in-law of living in the unit; attempting, unsuccessfully, to have Ms. Webster arrested for intentional property damage; and repeatedly driving up and down the street in front of the house she moved into after leaving Forum Manor.  (Id. at 16).

Complainant Mr. Howard, a Caucasian single father with two children, alleges that in early October 2008, he called the Forum Manor's rental office and left messages requesting a rental application.  (Id. at 17).  Although there were vacant units at Forum Manor at this time, Mr. Harris returned his call and indicated no units were available.  (Id.).  Nonetheless, Mr. Howard went to Forum Manor's rental office that day to submit an application.  (Id. at 18).  After telling Mr. Harris that he was a single father and self-employed, Mr. Howard alleges that Mr. Harris refused to provide

him an application and responded that he " had something for single mothers but not single fathers," or words to that effect.  (Id. at 18).  Complainant Ms. Smith, a 24-year-old Forum Manor tenant with two children, alleges that Mr. Harris told her that she was "hot" and "looked good for a woman with two children," or words to that effect.  (Id. at 21).  Ms. Smith contends that Mr. Harris tried to convince her not to have a boyfriend, invited her to dinner, asked her to help him clean his house, and touched her by rubbing her shoulders and back making her feel uncomfortable.  (Id. at 21).  Ms. Smith further alleges that in December 2007, Mr. Harris came to her apartment uninvited late one evening while her boyfriend was away, and he made unwelcome sexual advances, which she spurned. (Id. at 22).  After marrying Jess Smith, her boyfriend in February 2008, Ms. Smith attempted to add him to the lease, but Mr. Harris refused to process the application and refused to allow Mr. Smith to live with his wife at Forum Manor.  (Id. at 23).  A couple of days after being interviewed by a HUD investigator in her apartment, Mr. Harris pulled up in his truck and blocked one side of the van while Mr. and Mrs. Smith were placing their children into their van at Forum Manor.  (Id. at 25).  Ms. Smith alleges that Mr. Harris exited his truck and started yelling at her in front of the children.  (Id.). As a result of Mr. Harris' discriminatory conduct and actions, Mr. and Mrs. Smith moved out of Forum Manor in November 2008.  (Id. at 26).

After investigating the complaints, HUD determined reasonable cause existed to find Defendants violated the FHA.  (Id. at 28).

### 3. The Insurance Policy

The Policy, which is attached to the Complaint as Exhibit A, provided coverage to Hediger Enterprises, Inc. as the named insured.  (Exhibit A).  The Policy provided the following coverage:

**SECTION I - COVERAGES**

## COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1.     Insuring Agent**

   **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply ...

   ...

   **b.**     This insurance applies to "bodily injury" and "property damage" only if:

   **(1)**     The insurance applies to "bodily injury" and "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)**     The "bodily injury" or "property damage" occurs during the policy period;....

**2.     Exclusions**

This insurance does not apply to:

   **a.     Expected Or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured....

(Exh. A at 2).

   ...

## COVERAGE B.  PERSONAL AND ADVERTISING LIABILITY

   **1.     Insuring Agreement**

      **a.**     We will pay those sums that the insured becomes     legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those   damages. However, we will have no duty to defend the insured against any "suit' seeking damages for "personal and advertising injury" to which

this insurance does not apply.  We may, at our discretion, investigate
any offense and settle any claim or "suit" that may result....

...

(Id. at 8-9).

## SECTION II - WHO IS AN INSURED

**1.**     If you are designated in the Declaration as:

    **d.**     An organization other than a partnership, joint venture or limited liability
company, you are an insured.  Your "executive officers" and directors are
insureds, but only with respect to their duties as your officers or directors.
Your stockholders are also insureds, but only with respect to their liability as
stockholders.

**2.**     Each of the following is also an insured:

    **a.**     ... your "employees"..., but only for acts within the scope of their employment
by you or while performing duties related to the conduct of your business.

(Id. at 13).

## SECTION V - DEFINITIONS

...

3.     "Bodily injury" means bodily injury, sickness or disease sustained by
a person, including death resulting from any of these at any time.

...

13.     "Occurrence" means an accident, including continuous or
repeated exposure to substantially the same general harmful
conditions.

...

14.     "Personal and advertising injury" means injury, including
consequential "bodily injury," arising out of one or more of
the following:

...

      c.      The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

17.      "Property damage" means:

      a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      b.      Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18.      "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage" or "personal advertising injury" to which this insurance applies are alleged. "Suit" includes:

      a.      An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

      b.      Any other alternative dispute resolution proceeding in which such damages are claimed at to which the insured submits with our consent.

...

(<u>Id.</u> at 22-23).

**ENDORSEMENT**

**OTHER EXCLUSIONS**

...

4.      WRONGFUL ACTS including,

....

      b.      with regards to Discrimination, liability arising from alleged or real acts of discrimination by you whether such

discrimination is based on age, health, illness, sex, sexual preference, disability, race, country of origin or religion. This insurance does not apply to, or provide, defense of "suits" or claims, loss costs, supplementary payments of claims or defense expense arising from any of the above;

       c.    with regard to Sexual Misconduct, liability arising out of or resulting from real or alleged acts of sexual abuse, sexual

harassment, or licentious immoral or sexual behavior intended to lead to, or culminating in any sexual act, whether caused by, or at the instigation of, or at the direction of, or omission by, you, your employees, or patrons. This insurance does not apply to, or provide, defense of "suits" or claims, loss costs, supplementary payments, or claims and defense expenses arising from any of the above.

(Id. at 53).

## 4. The December 14, 2009, Letter

In a letter dated December 14, 2009, Mr. Russell Watters, attorney for Essex, noted that his firm had been retained by Essex "to investigate and review coverage applicable under Policy No. ARTX001297, issued by Essex Insurance Company ("Essex") to Hediger Enterprises, Inc., with the effective dates of October 1, 2007, through October 1, 2008" regarding the HUD Complaint. (Deft.'s Exh. B at 1). After completing its preliminary determination of coverage as to the claim submitted for coverage, Essex determined in relevant part as follows:

    ...to provide all Defendants with a defense in this action. There are, however, issues with respect to the requested coverage, and it appears that coverage may be barred, in whole or in part, for the claims brought against Defendants in this action. Accordingly, Essex's defense in this matter will be provided in accordance with the reservation of rights set forth below. Essex expressly advises you that, based on its preliminary investigation, the company's position is that there will be no indemnity coverage for this loss in the event any defendant becomes legally obligated to pay a judgment or settlement. Further, Essex expressly reserves its right to file a declaratory judgment action against Mr. Harris, Hediger Enterprises, Inc., Forum Manor Associates, L.P., and Forum Manor, L.L.C. and any other potential insured under the Policy to determine its rights and obligations to provide a defense and/or indemnity for this lawsuit.

(Id.).  The letter directed Mr. Hediger to the coverages section, bodily injury and property damage liability and personal and advertising injury liability, and other the endorsement section, other exclusions.  (Id. at 2-5).

In the letter, Essex apprised Mr. Hediger in relevant part that:

Essex reserves the right to deny coverage for any claims in the Complaint that do not fall into the Policy's Bodily Injury and Property Damage coverage as outlined above.  The language of the Policy provides coverage for "bodily injury" caused by an "occurrence."  "Bodily injury" is further defined as "bodily injury, sickness or disease sustained by a person," and an "occurrence" is further defined as an "accident."

Based upon our investigation of this claim, it does not appear that the Complaint alleges bodily injury caused by Defendants as that term is defined in the Policy.  As such, it appears that there is no Bodily Injury and Property Damage coverage for the claims against Defendants.  Essex expressly reserves its right to deny coverage on this basis.  Essex expressly reserves its right to deny coverage on this basis.  Essex also expressly reserves its right to deny coverage to the extent that the claims against Defendants fall into the Policy's exclusions for "Expected or Intended Injury" or "Wrongful Acts."
...

... Finally, Essex expressly reserves its right to deny coverage to the extent that the claims against Defendants fall into the Policy's exclusions for "Knowing Violation of Rights of Another," "Criminal Acts," and "Wrongful Acts."
...

Essex will provide a defense to you in this matter under a full reservation of its rights.  This means that by defending you, we do not concede that the policy covers you for any liability you may have in this lawsuit.  We reserve the right to withdraw the defense at any time in the event that there is no coverage, and to assert any coverage defense available under the Policy.

Please let us know if you believe this reservation of rights is erroneous.  We are willing to review any information or analysis you wish to give us regarding this coverage and defense position.  We reserve the right to review our coverage position again, and change or add to it should the governing Complaint be amended or additional facts come to our attention.

It is expressly understood that any action we take to investigate, to adjust, or to defend this action shall not be construed as a waiver of our rights to deny coverage

to you under the Policy.  We reserve the right to commence and prosecute a declaratory action to obtain a judicial determination of whether the Policy affords coverage for any of the claims set forth in this action and of our obligation, if any, to defend this action.

(Id. at 5-7).

## Discussion

In Missouri, the duty to defend is broader than the duty to indemnify.  Truck Ins. Exch. v. Prairie Framing, LLC., 162 S.W.3d 64, 79 (Mo. Ct. App. 2005).  "An insurance company has a duty to defend an insured when the insured is exposed to potential liability to pay based on the facts known at the outset of the case, no matter how unlikely it is that the insured will be found liable and whether or not the insured is ultimately found liable." Id. (quoting King, King Constr., Inc.  v. Cont'l W. Ins. Co., 123 S.W.3d 259, 264 (Mo. Ct. App. 2003)).  The duty to indemnify, in contrast, is "determined by the facts as they 'are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement.'" Lumbar Mut. Ins. Co. v. Reload, Inc., 113 S.W.3d 250, 253 (Mo. Ct. App. 2003) (quoting McCormack Baron Mgmt. Servs., Inc. v. American Guarantee & Liab. Ins. Co., 989 S.W.2d 168, 173 (Mo. banc 1999)).[1]  Essex contends that it has no duty to defend Defendants.

> To extricate itself from a duty to defend the insured, the insurance company must prove that there is no possibility of coverage.  Coverage is principally determined by comparing the language of the insurance policy with the allegations in the pleadings.  However, even though the pleadings do not show coverage, where known or reasonably ascertainable facts become available that show coverage[,] the duty to defend devolves upon the insurer.

---

[1]In this case, a claim for indemnity is not ripe for ruling at this time since the underlying action has not yet been resolved.  However, "[w]here there is no duty to defend, there is no duty to indemnify." Am. States Ins. Co. v. Herman C. Kempker Constr. Co., (Mo. Ct. App. 2002). Therefore, if the undersigned finds that Essex does not have a duty to defend the Defendants in the HUD action, neither will it have a duty to indemnify.

Truck Ins., 162 S.W.3d at 79 (internal citations and quotation marks omitted). In addition to the allegations in the complaint, the insurer must also consider other facts it knew or could reasonably have ascertained. Id. Thus, "[t]he insurer cannot ignore safely actual facts known to it or which could be known to it or which could be known from reasonable investigation." Standard Artificial Limb, Inc. v. Allianz Ins. Co., 895 S.W.2d 205, 210 (Mo. Ct. App. 1995). "[A]ctual facts are those facts which were known, or should have been reasonably apparent at the time of commencement of the suit and not the proof made therein or the final result reached." State ex re. Inter-State Oil Co. v. Bland, 354 Mo. 622, 190 S.W.227, 229 (1945). If the allegations and ascertainable facts establish any potential and possible coverage then the insurer has a duty to defend. Truck Ins., 162 S.W.3d at 79. The duty to defend exists if the complaint contains other claims that would not be covered. Id.

In construing the policy, the Court must give each term its ordinary, lay meaning unless the policy expressly defines a term in a technical manner. Farmland Indus., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508 (Mo. banc 1997). Finally, any ambiguities are resolved in favor of coverage. Aetna Cas. & Sur. Co. v. Haas, 422 S.W. 2d 316, 321 (Mo. 1968) ("[T]he language must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor.") (internal quotation omitted). Any uncertainty as to the policy's coverage should be decided in favor of the insured. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 621 (8th Cir. 1981). "[P]rovisions limiting or cutting down, or avoiding liability in the coverage made in the policy are construed most strongly against the insurer." Crossman v. Yacubovich, 290 S.W.3d 775, 779

(Mo. Ct. App. 2009). A court "strictly construes exclusionary clauses against the drafter, who also bears the burden of showing the exclusion applies." Burns v. Smith, 303 S.W.3d 505, 509 ((Mo. 2010).

Even though it is an insurer that brings a declaratory judgment action, the insured has the burden of proving that the underlying action is covered by the insurance policy. Auto Club Inter-Ins. Exch. v. Medrano, 83 S.W.3d 632, 638 (Mo. Ct. App. 2002). Ths insurer bears the burden of establishing that an exclusion to coverage applies. Id.

The undersigned finds that Defendants had knowledge of the alleged discrimination or ratified the actions of Mr. Harris. See, e.g., Meyer v. Holley, 537 U.S. 280, 285 (2003) (stating that '[i]t is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment). Traditional principles of agency law determine whether a principal can be held liable without fault under the FHA for the actions of his agents. Id. at 290-91. "The Restatement § 1 specifies that the relevant principal/agency relationship demands not only control (or the right to direct or control) but also 'the consent by the other so to act'" Id. As explained above, to invoke the duty to defend, the allegations, combined with the ascertainable facts, need only establish potential or possible coverage under the policy.

In Cleveland v. Caplaw Enters., 448 F.3d 518, 522 (2d Cir. 2006), the Second Circuit applied federal-law agency principles in an FHA case and found the violations by employees authorized to make housing decisions fell squarely within the scope of their employment and held the owner vicariously liable for their discriminatory refusal to rent by property manager.

A.        No Waiver of Coverage Defenses or Exclusions

All Defendants contend that Essex waived its right to contest coverage and/or assert defenses to coverage under the Policy. In support, Defendants cite to the reservation of rights letter dated December 14, 2009 as evidence that Essex admitted coverage and simultaneously waived its coverage defenses and/or is estopped from claiming no coverage.

In the December 14, 2009, letter, Essex expressly reserved its right to later assert coverage defenses and to file a declaratory judgment action in relevant part as follows:

> There are, however, issues with respect to the requested coverage, and it appears that coverage may be barred, in whole or in part, for the claims brought against Defendants in this action. Accordingly, Essex's defense in this matter will be provided in accordance with the reservation of rights set forth below. **Essex expressly advises you that, based on its preliminary investigation, the company's position is that there will be no indemnity coverage for this loss in the event any defendant becomes legally obligated to pay a judgment or settlement.** Further, Essex expressly reserves its right to file a declaratory judgment action against Mr. Harris, Hediger Enterprises, Inc., Forum Manor Associates, L.P., and Forum Manor, L.L.C. and any other potential insured under the Policy to determine its rights and obligations to provide a defense and/or indemnity for this lawsuit.

(Deft.'s Exh. B at 1) (emphasis added). A review of the letter shows that Essex delineated the particular Policy provisions by which Essex contended coverage to be barred: (1) no "occurrence" as defined in the Policy for "Bodily Injury" coverage, (2) no personal or advertising injury. and the exclusions for "Knowing Violation of Rights of Another," "Criminal Acts," and Wrongful Act." (Id. at 3-5).

Defendants' waiver and estoppel arguments are without merit. Waiver is the intentional relinquishment of a known right by one of the parties to a contract. Brown v. State Farm Mut. Auto. Ins. Co., 776 S.W.2d 384, 387 (Mo. banc 1989). "Waiver is founded upon the intentional relinquishment of a known right. If waiver is implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right." Id. (internal quotation marks and quoted case

omitted).  In <u>Brown</u>, the Missouri Supreme Court highlighted the distinction between waiver and estoppel and defined them as follows:

> Classically, estoppel requires "(1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act." <u>Mississippi-Fox Drainage Dist. v. Plenge</u>, 735 S.W.2d 748, 754 (Mo. App. 1987). Waiver is founded upon "the intentional relinquishment of a known right."  If waiver is "implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right."  <u>Shapiro v. Shapiro</u>, 701 S.W.2d 205, 206 (Mo. App. 1985).

<u>Id.</u> at 386-87.

Under Missouri law, "[a]n insurance company can effect a proper reservation of rights when the company provides notice to an insured that its defense of an action should not be construed as a waiver of any policy defense and the insured accepts the defense of the action without protest and with full knowledge of the position of the insurance company of its right to assert non-liability." <u>Atlanta Cas. Co. v. Stephens</u>, 825 S.W.2d 330, 333 (Mo. Ct. App. 1992).  "Such a reservation of rights puts the insured on notice that there may be a conflict between the insured's interests and those of the insurance company and that the insured may be exposed to personal liability not covered by insurance."  <u>Id.</u>  The December 14, 2009, letter provided notice to Defendants of the policy provisions Essex believed precluded coverage and specifically stated that Essex was not waiving its right to assert those policy-related defenses.  The Court cannot hold as a matter of law that Essex waived its right to enforce the exclusions because there is no evidence in the record to show that Essex took any intentional or voluntary act with the clear and unequivocal purpose of relinquishing its rights to enforce the policy provisions.  <u>See</u> <u>MCI Metro Access Transmission Servs., Inc. v. City of St. Louis</u>, 941 S.W.2d 634, 639-40 (Mo. Ct. App. 1997) ("The conduct must be so manifestly

consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation is possible." (internal quotation marks and quoted case omitted)). Accordingly, the Court declines to find that Essex's issuance of a reservation of rights letter had an adverse effect on Essex's right to later assert a coverage defense. See e.g., Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1029-30 (8th Cir. 2003) (finding under Missouri law the insurer's letters to insured denying coverage for specified reasons does not waive policy notice defense). The Court finds that Essex did not waive its right to contest coverage under the Policy.

B.        Complaint Fails to Allege Occurrence under the Policy

Essex contends that allegations set forth in the HUD Complaint do not fall under the Policy because such allegations do not constitute an "occurrence" within the meaning of the Policy. The undersigned must address whether there was an "occurrence" within the meaning of the Policy definition. The Policy defines "occurrence" to be an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Specifically, Essex asserts that although the Missouri courts have not yet addressed whether a violation of the FHA can be considered an "occurrence" under a commercial general liability policy, the Missouri courts have found that an employer's discrimination against an employee is an intentional act that does not fall under the definition of an "occurrence."[2]

_____

[2]Cases from other jurisdictions have addressed whether a violation of the Fair Housing Act can be considered an occurrence under an insurance liability policy and have found such violations to be intentional and not to be an "occurrence." See Vaughner v. Pulito, 804 F.2d 873, 877 (5th Cir. 1986) (finding no duty to defend in subsequent civil rights action that included allegations of Fair Housing Act violations because owner/landlord's refusal to rent to prospective tenants based on intentional racial animosity, and intentional actions which occurred while landlord administering and maintaining the apartment complex excluded from coverage); Rosenberg

In Angelina Cas. v. Pattonville-Bridgeton Terr. Fire Prot. Dist., 706 S.W.2d 483 (Mo. Ct. App. 1986), the insured was a fire protection district which was sued by two former employees who claimed that they were wrongfully discharged by the district for engaging in constitutionally protected activity. The policy provisions provided coverage for bodily injury or property damage caused by an "occurrence." Referring to the policy definition of "occurrence," the court opined:

> The policy defines "occurrence" as an "accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." This language excludes coverage for the insured's intentional acts.... Injury or damage is intentional if the insured has acted with the specific intent to cause harm and such intent can be inferred as a matter of law if the natural and probable consequences of an act are to produce harm.

Id. at 484 (internal citation omitted). The employees had pleaded that the insured has conspired to discharge them. The court found allegation to be based on intentional acts of the insured and thus there was no duty on the part of the insurance company to defend the employer's federal suit under its comprehensive general liability policy. Id. at 484-85. The court found the insurer had no duty to defend, because the employees' complaint was clearly framed in terms of intentional, not negligent, acts of the defendants. Id.

Citing Angelina, another court found that an employee's lawsuit asserting wrongful discharge and sex discrimination against her employer was not covered by the employer's liability policy inasmuch as plaintiff's discharge was intentional act regardless that the employer may not have

---

Diamond Dev. Corp. v. Wausau Ins. Co., 326 F.Supp.2d 472, 476 (S.D.N.Y. 2004) (finding an intentional act is not an "occurrence" with the meaning of the applicable commercial landlord policy); Hubel v. Madison Mut. Ins. Co., 2003 WL 21435624, at 2-3 (N.Y. Sup. May 16, 2003) (finding landlord's refusal to rent to potential tenant because of her familial status in violation of the Fair Housing Act required proof of discriminatory intent and thus neither involved an accident within coverage for occurrence under liability insurance policy).

intended the degree of injury which occurred. <u>Elliott v. National Fire Ins. Co. of Hartford</u>, 922 S.W.2d 791, 792-93 ((Mo. Ct. App. 1996). The insurer had issued a policy to the employer, and the plaintiff asserted that the employee, "acting on behalf of [the employer], intentionally discharged plaintiff. Although he may not have intended the degree of injury which did occur, he was substantially certain that some injury to plaintiff would result." <u>Id.</u> at 793. Noting the policy contained a definition of "occurrence" identical to the one in Angelina, the court found plaintiff's emotional distress was not the type of damage that the employer's policy covered, because her injuries were caused by an intentional act of defendant's insured. <u>Id.</u> at 793.

The HUD Complaint frames its allegations against the Hediger Defendants through the actions of Mr. Harris in terms of intentional acts. The United States alleges that Defendants engaged in discriminatory conduct and sexual harassment in violation of the FHA. In relevant part, the United States alleges that by their actions and statements Defendants intentionally refused to rent, refused to negotiate for rental, or otherwise made unavailable a dwelling on the basis of race; represented, because of sex, that a dwelling is not available for rental; and coerced and interfered with persons in the exercise of their rights under the FHA. In the Second Claim for Relief, the United States further alleged Defendants' actions constitute a pattern or practice of resistance to the full enjoyment of rights granted by the FHA. None of the alleged wrongful acts can be considered accidental. Accordingly, there is no "occurrence" under the Policy, and therefore no duty to defend.

In opposition, Hediger Defendants contend that the determination of what is an occurrence should be made considering their actions, not the actions of Mr. Harris, and as innocent employers, they are not responsible for Mr. Harris' conduct which was not within the scope of his employment.

The Supreme Court has held "it is well established that the [Fair Housing] Act provides for

vicarious liability," which "ordinarily make[s] principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." <u>Meyer v. Holley</u>, 537 U.S. 280, 285-86 (2003). "[T]he Act imposes liability without fault upon the employer in accordance with traditional agency principles." <u>Id.</u> at 287-88. Employers are liable even where the principal "did not authorize or did not know of the acts complained of." <u>Id.</u> at 285-86 (quoting <u>New Orleans, M. & C.R. Co. v. Hanning</u>, 82 U.S. 649, 15 Wall. 649, 657 (1873)) ("The principal is liable for the acts and negligence of agent in the course of his employment, although he did not know of the acts complained of.").

In the HUD Complaint, all of Mr. Harris' actions were in the scope of his employment and for the benefit of Hediger Defendants. It was within the scope of his employment that he was interacting with applicants and making judgments regarding applicants. The Complaint further contains allegations averring that "Hediger Enterprises hired Mr. Harris as the property manager of Forum Manor, both on its own behalf and on behalf of Forum Manor Associates, L.P. and Forum Manor LLC, and supervised him as its employee." (First Amended Complaint, Docket No. 28 at ¶ 6). In relevant part, the allegations set forth in the Complaint assert that Defendants "[r]efused to rent, refused to negotiate for the rental, ..., a dwelling because of race and sex;" "[d]iscriminated in the terms, conditions or privileges of the rental of a dwelling;" "[m]ade statements with respect to the rental of a dwelling that indicated a preference, limitation or discrimination based on race and sex;" "[r]epresented, because of sex, that a dwelling is not available for inspection or rental when such dwelling is in fact so available;" "[c]oerced, intimidated, threatened or interfered with persons in the exercise or enjoyment of, ..., their rights under the Fair Housing Act." (<u>Id.</u> at ¶ 32(a)-(e)). The undersigned finds that none of the alleged wrongful acts can be considered accidental inasmuch

as the alleged wrongful acts constitute intentional conduct. Accordingly, there is no occurrence under the Policy, and thus no duty to defend.

C.        Coverage Barred by Two Separate Exclusions

The interpretation of an insurance contract is generally a question of law, particularly in reference to the question of coverage. H.K. Porter Co. v. Transit Cas. Co., 215 S.W.3d 134, 140-41 (Mo. Ct. App. 2006). The issue of coverage becomes a jury question only when the court determines that the contract is ambiguous and that there exists a genuine factual dispute regarding the intent of the parties. See Graham v. Goodman, 850 S.W.2d 351, 354 (Mo. banc 1993). Missouri state law governs the undersigned's interpretation of the policy. McAuliffe v. Northern Ins. Co. of N.Y., 69 F.3d 277, 279 (8th Cir. 1995). To determine coverage issues, Missouri law provides that courts should compare the allegations in the underlying complaint to the language of the insurance policy. Reliance Ins. Co. v. Shenandoah South, Inc., 81 F.3d 789, 791 (8th Cir. 1996) (citing Benningfield v. Avemco Ins. Co., 561 S.W.2d 736 (Mo. Ct. App. 1978)). If the complaint alleges facts not within the coverage of an insurance policy, no duty to defend arises. Id. (citing Steve Spicer Motors, Inc. v. Federated Mut. Ins. Co., 758 S.W.2d 191, 193 (Mo. Ct. App. 1988)). When relying on an exclusion to demonstrate no possibility of coverage, the insurer has the burden of establishing that the exclusion applies. Stark Liquidation Co. v. Florists' Mut. Ins. Co., 243 S.W.3d 385, 394 (Mo. Ct. App. 2007).

1.        The "Wrongful Acts" Exclusion

Essex contends that the wrongful acts exclusion applies to bar coverage for the HUD Complaint under the Policy.

Although the Missouri courts have not addressed a wrongful acts exclusion in the context of

- 22 -

a claimed violation of the FHA, other state courts have found that discrimination exclusions bar coverage for FHA suits. See Turk v. TIG Ins. Co., 616 F.Supp.2d 1044, 1051 (D. Nevada 2009) (finding claims brought under Fair Housing Act to be exempt from coverage under exclusion for "any claim or suit based upon or alleging discrimination against any person."); American Nat'l Gen. Ins. Co. v. L.T. Jackson, 203 F.Supp.2d 674, 678-79 (S.D. Miss. 2001) (finding exclusion in rental owners policy for sexual molestation applied to deny coverage for sexual discrimination claims asserted against owner/manager of rental properties under the Fair Housing Act).

The HUD complaint contains allegations of conduct that falls under the wrongful acts exclusion. The exclusion bars coverages for "liability arising from the alleged or real acts of discrimination by you whether such discrimination is based on age, health, illness, sex, sexual preference, disability, race, country of origin or religion." (Exh. A at 53). This exclusion covers all forms of discrimination alleged in the HUD Complaint, race and sex. Accordingly, Essex has no duty to defend under the Policy for Defendants' conduct as alleged in the HUD Complaint, and Essex is entitled to judgment as a matter of law.

2.     The "Expected or Intended Injury" Exclusion

Essex contends that the absence of coverage for harm expected or intended arises from either the limitation of coverage to damages from bodily injury or property damages caused by an "occurrence," or the exclusion of injury expected or intended from the standpoint of the insured.

This exclusion excludes coverage for an "expected or intended injury." It provides that the insurance does not apply to "Bodily injury" or "property damage" expected or intended from the standpoint of the insured." (Exh. A at 2). For an exclusion for expected or intended conduct to bar coverage, the insurer must not only show that the insured intentionally acted, but also that the insured

expected or intended the result that occurred.  <u>American Family Mut. Ins. Co. v. Pacchetti</u>, 808 S.W.2d 369, 371 (Mo. banc 1991).  Whether an insured expected or intended injury is essentially a question of fact.  <u>Id.</u>  Furthermore, for an exclusion for expected or intended conduct to bar coverage, the insurer must show that the insured expected or intended the result which occurred.  <u>Id.</u> "It must be shown not only that the insured intended the acts causing the injury, but that injury was intended or expected from these acts."  <u>See</u> <u>Steelman v. Holford</u>, 765 S.W.2d 372, 377 (Mo. Ct. App. 1989).  Regardless of the actual intent of the insured, intent to cause injury can be inferred as a matter of law if the natural and probable consequences of an act are to produce harm.  <u>Angelina</u>, 706 S.W.2d at 484.

In accordance with the holdings of <u>Pacchetti</u>, if the record establishes that Defendants intended or expected any of the injuries for which Essex's Policy would otherwise provide coverage, then the exclusions within the Policy bar coverage.  The allegations in the HUD Complaint assert that Mr. Harris' actions were intentional, and thus any injury caused by his acts would necessarily be expected or intended.  Even if Mr. Harris did not believe his actions would have caused harm, the natural and probable consequences of his discriminatory and retaliatory acts resulted in denying housing to the HUD complainants.

D.        <u>Coverage under the Policy's Personal and Advertising Injury</u>

The Hediger Defendants contend that the allegations made in the HUD Complaint are covered under the Policy's Coverage B for Personal Injury and Advertising Injury.[3]  "Personal and advertising

_____

[3]The undersigned notes that in Hediger Defendants Memorandum in Opposition, Defendants allege coverage under Coverage B Personal Injury and Advertising Injury.  Although Essex has responded to this argument in its reply memorandum, the undersigned finds this is an entirely new and independent theory not raised in the summary judgment motion.  A party cannot assert a new theory of his case in defending a summary judgment motion or expand a claim to

- 24 -

injury" is defined in the Policy as "injury, including consequential 'bodily injury' arising out of one or more of the following defenses ... (c) the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy for the room, dwelling or premises by a person occupied, committed by or on behalf of the owner, landlord or lessor." Hediger Defendants argue that the factual allegations in the HUD Complaint are covered by this language. In support, Hediger Defendants cite to the allegations that Mr. Harris "came to Ms. Smith's apartment uninvited late one evening while her boyfriend was away," made unwelcome and sexual advances, and "repeatedly refused to leave the premises after Ms. Smith stated she was tired and wanted to go to bed." (Exh. A at ¶ 22).

Where the policy is unambiguous it is to be given effect according to its terms, and a court is not to read in contractual obligations where none were intended by the parties. M.F.A. Mut. Ins. Co. v. American Family Mut. Ins. Co., 654 S.W.2d 230, 232 (Mo. Ct. App. 1983).

A review of the HUD Complaint shows that the Complaint is devoid of any allegations of forced entry, trespassing, or unauthorized entry such that the alleged conduct could be considered an "invasion of the right of private occupancy." The undersigned finds that the allegations fail to state a claim which is potentially or arguably within the Policy's coverage, and therefore Essex has no duty to defend Hediger Defendants against the HUD Complaint. Missouri Terrazzo Co. v. Iowa Nat'l Mut. Ins. Co., 740 F.2d 647, 652 (8th Cir. 1984).

**IT IS HEREBY ORDERED** that Plaintiff Essex Insurance Company's Motion for Summary Judgment (Docket No. 25) is **GRANTED**.

A separate Judgment in accordance with this Memorandum and Order is entered this same

---

create a material issue of fact where none existed before. See Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 288-89 (8th Cir. 1988); Sorenson v. First Wisconsin Nat'l Bank of Milwaukee, N.A., 931 F.2d 19, 21 (8th Cir. 1991).

date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this __30th__ day of September, 2011.